**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**CHARLES HOWARD MARTIN,**

        **Plaintiff,**

**v.**                                        **Case 2:14-cv-02926-cgc**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

---

## ORDER AFFIRMING DECISION OF COMMISSIONER

---

Plaintiff has filed this action to obtain judicial review of Defendant Commissioner's final decision denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-434, 1381-1385. By consent of the parties, this case has been referred to the United States Magistrate Judge to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. §636(c) and Rule 73 of the Federal Rules of Civil Procedure.

The procedural history in the instant case spans nearly a decade. Plaintiff filed his application for DIB and SSI benefits on September 26, 2006. His claims were denied on February 1, 2007. Plaintiff requested reconsideration on April 5, 2007, which was denied on June 26, 2007. Plaintiff filed a request for a hearing on July 16, 2007 and appeared before Administrative Law Judge Paul Stimson ("ALJ Stimson") on February 10, 2009. ALJ Stimson issued an unfavorable decision on his claim on June 11, 2009. Plaintiff appealed, and, on January 12, 2011, the Appeals

1

Council remanded for further proceedings.

On May 3, 2011, Plaintiff appeared again before ALJ Stimson, who issued a second unfavorable decision on his claim on May 16, 2011. Plaintiff appealed to the Appeals Council and, while his appeal was pending, filed a subsequent claim for Title II and XVI benefits. The Appeals Council issued a second remand on April 25, 2013. The Appeals Council also determined that its "action with respect to the current claims renders the subsequent claim duplicate" and, therefore, directed the ALJ to "associate the claim files and issue the new decision on the associated claims."

On August 22, 2013, Plaintiff appeared before Administrative Law Judge William R. Ingram ("ALJ Ingram"). On September 26, 2013, ALJ Ingram issued an unfavorable decision on Plaintiff's claim. Plaintiff appealed ALJ Ingram's decision to the Appeals Council, and the appeal was denied on October 15, 2014. This decision became the Commissioner's final decision. Plaintiff then filed this action, requesting reversal of the Commissioner's decision. For the reasons set forth below, the decision of the Commissioner is AFFIRMED.

Pursuant to 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he was a party. "The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* The court's review is limited to determining whether or not there is substantial evidence to support the Commissioner's decision, 42 U.S.C. § 405(g); *Wyatt v. Secretary of Health & Human Services*, 974 F.2d 680, 683 (6th Cir.1992); *Cohen v. Secretary of Health & Human Services.*, 964 F.2d 524, 528 (6th Cir.1992), and whether the correct legal standards were applied, *Landsaw v. Secretary of Health & Human Servs.,* 803 F.2d 211, 213 (6th Cir.1986).

The Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations and resolve material conflicts in the testimony, and to decide the case accordingly. *See Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984). When substantial evidence supports the Commissioner's determination, it is conclusive, even if substantial evidence also supports the opposite conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Plaintiff was born on March 18, 1958 and was forty-two-years old as of the alleged onset date of February 28, 2001. (R. at 18, 33, 313). Plaintiff has at least a high school education and is able to communicate in English. (*Id*. at 18). Plaintiff has past relevant work as a bus driver and financial loan officer. (*Id*.) As to Plaintiff's pertinent personal history for purposes of his benefit eligibility, "the record shows the claimant was found guilty of tax fraud and possession of a firearm as a felon and he was incarcerated sometime in 2000 until April 2006." (*Id*.)

ALJ Ingram determined in his final decision as follows: (1) Plaintiff meets the insured status requirements of the Social Security Act through December 3, 2002; (2) Plaintiff has not engaged in substantial gainful activity since February 28, 2001, the alleged onset date; (3) Plaintiff has severe impairments of migraine headaches, hiatal hernia, gastritis, venous insufficiency, degenerative disc disease, obesity, rule out borderline intellectual functioning, affective disorder, anxiety disorder, and personality disorder; (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Plaintiff is unable to perform any past relevant work because the requirements of this work exceed his residual functional capacity ("RFC"); (6) considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the

national economy that the claimant can perform; (7) Plaintiff has not been under a disability as defined in the Act from February 28, 2001 through the date of his decision. (R. at 20-35).

The Social Security Act defines disability as the inability to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1). The claimant bears the ultimate burden of establishing an entitlement to benefits. *Born v. Secretary of Health & Human Services.*, 923 F.2d 1168, 1174 (6th Cir.1990). The initial burden of going forward is on the claimant to show that she is disabled from engaging in her former employment; the burden of going forward then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. *Id.*

The Commissioner conducts the following, five-step analysis to determine if an individual is disabled within the meaning of the Act:

1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. An individual who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the regulations.[1]

4. An individual who can perform work that he has done in the past will not be found to be disabled.

---

[1] Before then proceeding to step four of the sequential evaluation process, the ALJ must determine the claimant's residual functional capacity ("RFC") pursuant to 20 C.F.R. 404.1520(e) and 416.920(e). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe pursuant to 20 C.F.R 404.1520(e), 404.1545, 416.920(e), 416.945

5. If an individual cannot perform his or her past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301 (6th Cir. 1988). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520.

Here, the sequential analysis proceeded to the fifth step. At step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's RFC . . . and vocational profile." *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). Ultimately, the ALJ found that Plaintiff is capable of making an adjustment to other work that exists in significant numbers in the national economy, and, therefore, was not disabled within the meaning of the Act.

On appeal to this Court, Plaintiff has presented four issues for review. First, Plaintiff argues that the ALJ erred by failing to assign nonexertional impairments from both chronic migraines and social functioning secondary to mental illness in crafting his RFC. Second, Plaintiff argues that the ALJ erred in weighing the opinion evidence in the record in crafting his RFC. Third, Plaintiff argues that the ALJ erred in failing to obtain vocational expert testimony in Step Five. Fourth, Plaintiff argues that the ALJ erred in determining that significant numbers of jobs exist in the national economy that Plaintiff could perform.

## I. Failure to Assign Nonexertional Impairments in RFC Analysis

As to the first issue, Plaintiff raises three objections to ALJ Ingram's findings in his RFC determination: (1) that ALJ Ingram "implied that [Plaintiff] was malingering during the examination

with Dr. Rutledge" contrary to Dr. Rutledge's own professional opinion; (2) that ALJ Ingram provides no examples of how Plaintiff was "vague," "inconsistent," or "generally not very credible"; and, (3) that ALJ Ingram mischaracterized Plaintiff's lack of treatment from the time of his release from prison in April 2006 until he underwent an assessment in December 2006.

### A. Malingering

The record reflects that ALJ Ingram relied on Dr. Stephen C. Rutledge's ("Dr. Rutledge") determination that Plaintiff was "occasionally evasive, guarded and vague" to conclude that "it is therefore reasonable for one to believe the claimant's failure to remain on topic could be evidence of his attempt to portray himself as more limited than he actually is." (R. at 31, 1038). However, Dr. Rutledge determined that Plaintiff "showed no evidence of malingering" and gave "a reasonable, but guarded, amount of effort throughout the interview." (R. at 1038). Plaintiff argues that Dr. Rutledge's conclusion that Plaintiff was not malingering is consistent with Dr. Kristin L. Gant's ("Dr. Gant") determination, (R. at 1128 ("He showed no evidence of malingering.")), and with the other consultative and independent examinations in the record that do not reference malingering as an impression or diagnosis, (R. at 683, 698, 1027-28, 1117, 1204). Dr. Rutledge also concluded that Plaintiff's "current psychiatric state was depressed and anxious with apparent delusional qualities." (R. at 1040).

The Commissioner responds that "Plaintiff's premise is that the ALJ simply accused him of malingering, and used this rationale to ignore evidence of record." The Commissioner characterizes this as a "false premise," asserting that the ALJ "offered a detailed discussion of both Plaintiff's social function and his treatment for migraines" and did not rely "solely on his 'malingering' to assess his mental limitations and social functioning." The Commissioner further argues that the ALJ

considered "Plaintiff's allegations, inconsistencies between those allegations and other evidence in the record, Plaintiff's treatment history, and daily activities" in determining his RFC.

Specifically, as to Plaintiff's social functioning, the ALJ concluded that Plaintiff has "moderate difficulties" but that he "spends time with others, regularly attends church, and occasionally does volunteer work" and that he "was polite during face-to-face interviews." (R. at 21 (citing Exhs. 2E, 6E, 7E, 7F, 11E, 12E, 17E, 18E, 19E, 24F, 44F, 45F, and 47F)); *see also* R. at 681). This is in contrast to Plaintiff's own testimony that he does not like other people, has "attack[s]" around others, does not interact with others on a weekly basis, only attends church a "little bit" and "sit[s] away from company," has trouble with supervisors, and is only able to do "[v]ery little" around the house. (R. at 71-77).

Additionally, Plaintiff summarizes his usual "daily activities" as follows:

I get up and I'll try . . . to dress myself, . . . eat and try to do some simple chores or . . . help around the house a little bit, . . . some of the housecleaning. Around lunchtime, . . . I'll sit down and rest . . . for a little bit and watch a little TV and get back up again and maybe make a few phone calls or . . . talk to my wife again or . . . something like that.

After my nap, . . . I get back up and try to repeat the process. Some of the days, sir, I'm not even able to get up at all. Several days out of the month I'm confined strictly to my bed [due to mental issues and migraines.]

(R. at 76). Plaintiff further describes a "good day" as follows:

I get up and dress myself; take a shower; watch TV; help my wife . . . with the chores. Sometimes we'll go out, . . . maybe go shopping. On . . . Wednesday night . . . I'll try to go to . . . listen to the church . . . . [W]e have a weekly choir practice. Come back in, . . . and watch TV and . . . maybe read a book or . . . relax a little bit on the . . . couch or just something that—again, something to chill out so I won't really get upset or real nervous or anything.

(R. at 77).

Thus, the Commissioner argues that, based upon the entirety of the record and Plaintiff's own testimony, he has failed to meet his burden that the ALJ's final decision was unsupported by substantial evidence.

Upon review, while it is a duty of the medical expert sources to consider whether a patient appears to malingering, it is the duty of the ALJ to determine whether a claimant is credible. While Plaintiff requests that this Court consider one sentence from ALJ Ingram's opinion to conclude that he disregarded Dr. Rutledge's medical conclusion and substituted his own, a review of the entirety of ALJ Ingram's decision demonstrates that he painstakingly considered the record, including Plaintiff's own testimony and the medical evidence, in reaching his conclusion as to Plaintiff's RFC. (R. at 22-33). Accordingly, as ALJ Ingram's determination as to Plaintiff's credibility must be considered upon review of the entire record on ALJ Ingram's findings on Plaintiff's credibility, the Court will proceed to address this issue along with ALJ Ingram's complete findings on that issue.

### B. Plaintiff's Credibility

Plaintiff asserts that ALJ Ingram provides no examples of how Plaintiff was "vague," "inconsistent," or "generally not very credible." In addition to the medical evidence summarized in Section I.A and ALJ Ingram's conclusions therefrom, the record further reflects that ALJ Ingram concluded that Plaintiff's "testimony during the hearing was also vague, inconsistent with the actual medical record, and generally not very credible." (R. at 29). Plaintiff avers that ALJ Ingram reached this conclusion after only briefly questioning Plaintiff about "his full name, date of birth, age, education, work experience, alleged impairments, medical treatment, and an altercation with another inmate in prison," (R. at 48-54), and without stating this conclusion on the record during the hearing or further cross-examining him about his veracity, (R. at 48-65). The record reflects that Plaintiff's

characterization of ALJ Ingram's summary of his questioning of Plaintiff is correct, although ALJ Ingram did additionally discuss the specifics of Plaintiff's imprisonment and certain of Plaintiff's alleged impairments in further detail.  With respect to Plaintiff's "medical problems," ALJ Ingram, Plaintiff, and his attorney had the following exchange regarding Plaintiff's mental health:

[PLAINTIFF'S ATTORNEY]: Tell him your medical problems.

[PLAINTIFF]: Severe depression; I have anxiety; some hallucination; I have severe migraines where I have to take injections for those three to four times weekly.

BY ADMINISTRATIVE LAW JUDGE:

Q: When's the last time you had a hallucination?

A: Just this morning, sir.

Q: What did you do?  What happened?

A: I was dreaming that somebody took a gun and shot me in the heart.

Q: You dreamed it?  Is that what you'd call a hallucination?

A: It wasn't really a dream.  It was just like a vision where somebody came in and they took a gun and they shot me and I felt the impact going right in my chest.

Q: But you take medicine for that?

A: Oh, yes.  The medicine did not—the medicine will help, but don't cure it.  I take several medicines.

Q: Do you hear voices?

A: Yes sir, I do.

Q: What's the voices say?

A: (No audible response.)

Q: And who are the voices?

A: It's really—again, it's a vision of, of the past activities I've had during the day or the people I've came in contact with or the people I want to hear from or the past, back when I was incarcerated, just it—it's just a review of the, the—a lot of activities I've had in the past.

(R. at 51-52).

ALJ Ingram and Plaintiff additionally had the following exchange regarding Plaintiff's physical health:

Q: Physically you're ok, right?

A: No, sir.

Q: What's wrong?

A: Again, I, I have some back problems. I have swelling/edema in my ankles, some swelling in my ankles and, again, I have the severe migraine headaches that sometimes keeps me in bed for the biggest portion of the . . . day.

(R. at 53-54).

The Commissioner responds that the ALJ adequately stated his reasons on the record for determining that Plaintiff's testimony was not credible. Specifically, the ALJ concluded that, "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. at 23). "The record shows the claimant has a sporadic history of mental health treatment dating back to January 2002 while he was incarcerated and he has been variably diagnosed with" numerous mental health disorders. (*Id.*) "However, the claimant's varying diagnoses illustrate the absence of a consistent and ongoing symptom pattern of any recognized mental pathology, and the record certainly does not

document any ongoing objected clinical manifestations (psychomotor agitation/retardation, etc.) of a significant mental pathology, certainly not any that would produce more than moderate corresponding functional limitation." (*Id*.) "In fact, the record shows the claimant's mood was occasionally eurhythmic and pleasant . . . and his appearance, eye contact, speech, psychomotor activity, attention and concentration, recent and remote memory, thought process, thought content, attitude, and judgment were often within normal limits . . . ." (*Id*.)

The ALJ continued to find that "the claimant's varying diagnoses appear to be primarily based upon his subjective complaints of symptoms rather than actual objective medical evidence. Moreover, many of the claimant's reported mental symptoms actually appear to be acute emotional reactions to normal situational life stressors rather than signs of a chronic mental pathology." (*Id*. at 24 (citing Exh. 20F ("[m]arital difficulties"); Exh. 23F ("financial stress"); Exh. 28F ("life problems with finances and kids."))). In fact, the overwhelming majority of the claimant's reported mental symptoms appear to stem from his incarceration for tax evasion in 2000 and his resultant legal difficulties and inability to work in the same occupation . . . and subsequent mental health treatment during much of 2007 was primarily focused on problems with his probation officer . . . ." (*Id*. at 24).

The ALJ determined that the "record also documents inconsistencies in the claimant's subjective self-reported mental symptoms, particularly regarding hallucinations . . . ." (*Id*.) The ALJ reasoned that "the record shows any mental symptoms the claimant may experience appear to be well controlled with medication . . . ." (*Id*. at 24-25). The record documents some occasional complaints of severe headaches which have been diagnosed as migraines and the claimant has been prescribed corresponding medication." (*Id*. at 24). However, the record "does not document ongoing

complaints of nausea, vomiting, photophobia, or other migraine-related symptoms, and it certainly does not document any corresponding hospitalizations or frequent emergency room visits. (*Id*. at 24-25). The ALJ also determined that the record reflected contradictory evidence on several of Plaintiff's physical impairments, including spinal, gastrointestinal, and circulatory pathology. (R. at 25-26). The ALJ concluded that he would "[n]evertheless . . . weigh the objective medical evidence above in the claimant's favor and reduce his physical residual functional capacity accordingly." (R. at 26). The ALJ also reduced his RFC due to his obesity, as he concluded that it would "likely exacerbate any physical symptoms he may experience associated with these severe medically determinable physical ailments." (R. at 26).

As to Plaintiff's additional complaints of physical impairments, including seizures and vision problems, the ALJ concluded that they are "not well supported and do not warrant any further reduction." (R. at 26-27). The ALJ further bolstered this determination by summarizing the evidence in the record as to these alleged impairments. With respect to Plaintiff's alleged seizures, the ALJ found that "the record does not document any ongoing complaint of seizure activity," the "use of prescribed anticonvulsants," "any corresponding hospitalizations or emergency room visits for convulsions, syncopal episodes, or any other possible seizure-related activity," or even that Plaintiff "has ever actually been diagnosed with seizures." (R. at 26).

With respect to Plaintiff's alleged vision impairments, the ALJ found that, while the record reflects that Plaintiff had a "past surgical history involving his eyes," it "does not actually document objective medical evidence of any corresponding etiology (retinopathy, etc.)" and "certainly does not document ongoing complaints of blurred vision or any other vision-related symptoms." (*Id*.) On the contrary, the record reflects that Plaintiff "drives and enjoys reading the newspaper, which

certainly does not reflect an individual whose vision is significantly impaired." (*Id.*)

As to any other physical impairments, the ALJ found that the "record does not document diagnostic evidence . . . or ongoing objective clinical manifestations . . . of any other significant physical pathology, and the consultative medical examinations . . . were otherwise unremarkable." (*Id.* at 26-27). Thus, the ALJ concluded that "[m]aybe the most telling with respect to claimant's physical impairment-related allegations, the record does not document any physician visits involving a physical symptom complaint in 2007 or 2009 and it only documents one such visit in 2010 . . . and 2011, four such visits in 2012 . . . , and two such visits in 2013. Therefore the record only documents a total of eight physician visits involving a physical symptom in the approximate eighty-eight months prior to the hearing. Moreover, the record shows most of these physician visits were for the primary purpose of either refilling medications or treating acute illnesses. (R. at 27).

The ALJ found that, "in addition to lack of objective medical evidence, inconsistencies found in this record also weaken the claimant's subjective credibility and raise doubts about the veracity of his allegations." (*Id.*) Although Plaintiff has alleged disability beginning on February 28, 2001, the record does not document any medical treatment prior to January 2002. (*Id.*) The record reflects that Plaintiff actually discontinued working as a loan officer in 1999 when his home and office were "raided by the Internal Revenue Service" and he was convicted of "tax fraud, assistance in evading taxes, and possession of a firearm in commission of a felony," offenses for which he spent six-and-a-half years in prison. (*Id.* & Exh. 5F-7F, 32F).

The record reflects that Plaintiff earned a commercial driver's license in 2006 and briefly worked as a driver/chauffeur in 2006, which the ALJ concluded was "not consistent with an individual suffering from such alleged incapacitating symptoms." (*Id.*) Although Plaintiff has

alleged that he discontinued this work due to a disability, he has stated that he actually discontinued

working due to reasons unrelated to disability, including relocating to Dyersburg from Memphis and

being unable to find local routes due to his felony convictions. (*Id*. & Exhs. 1E, 3E, 7F). The record

reflects that Plaintiff also worked as a "laborer" for two companies through a staffing agency and,

while he again alleges that he discontinued the work due to disability, the record reflects that he did

not work because he did not receive any assignments. (*Id*. at 26-27 & Exhs. 1E & 7F). Based upon

this evidence, the ALJ concluded that the "record strongly suggests that the claimant's primary

obstacle to employment since his release from prison has been his criminal record." (*Id*. at 27 &

Exh. 3E).

The ALJ found that the "record documents daily activities that are not consistent with those

of an individual suffering from such alleged incapacitating symptoms either. For example, the

record shows the claimant tends to his personal care, prepares meals, performs household chores,

drives, shops in stores, spends time with others, attends church, and enjoys playing cards, reading

the newspaper, and solving crossword puzzles." (*Id*. at 28 & Exhs. 6E, 7E, 11E, 12E, 18E, 19E,

23E, 24F, 26E, 28F, 32F, 38F, 44F, 45F, and 47F). The ALJ also concluded that the record "shows

the claimant can count change, pay bills, handle a savings account, and use a checkbook/money

orders and he occasionally performs yard work, does volunteer work, and travels. (*Id*. & Exhs. 6E,

7E, 12E, 19E, 23F, 24F, 28F, 32F, 38F, 44F, 45F, and 47F). The ALJ found that the "record shows

Social Security Administration personnel reported the claimant did not have any difficulty hearing,

reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing,

walking, seeing, using his hands, or writing during face-to-face interviews . . . ." (*Id*. at 28 & Exhs.

2F & 17E). The ALJ determined that, "although the claimant has provided a myriad of reasons for

why he is disabled, the record shows his allegations are generally inconsistent and inherently vague."  (*Id*. at 28-29 & Exhs. 3E, 6E, 7E, 7F, 12E, 16E, 19E, 26E, 32F, 43F, 44F, and 47F).  The ALJ also concluded that Plaintiff's testimony during the hearing was "vague, inconsistent with the actual medical record, and generally not very credible."  (*Id*. at 29).

With respect to credibility determinations, this Court "must affirm the ALJ's decision if his findings and inferences are reasonably drawn from the record or supported by substantial evidence even if that evidence could support a contrary decision."  *Wright-Hines v. Comm'r of Social Security*, 597 F.3d 392, 393 (6th Cir. 2010).  The ALJ's credibility assessment is "virtually unchangeable" as long as the ALJ cites substantial, legitimate evidence to support his conclusions."  *Ulman v. Comm'r of Social Security*, 693 F.3d 709, 713-14 (6th Cir. 2012); *Ritchie v. Comm'r of Social Security*, 540 F. App'x 508, 511 (6th Cir. 2013).

Upon review, the ALJ methodically considered the extensive evidence in the record and set forth in great detail his findings based upon it.  These exhaustive findings constitute substantial, legitimate evidence to support his conclusions.  Accordingly, this Court concludes that the ALJ did not err with respect to his findings on Plaintiff's credibility.

### C.  Lack of Treatment

Next, Plaintiff argues that the ALJ mischaracterized Plaintiff's lack of treatment from his release from prison in April 2006 until he underwent an assessment in December 2006.  Plaintiff asserts that the ALJ "appears to imply" that Plaintiff's illness "was either not serious or being exaggerated in an attempt to qualify for disability benefits."  Plaintiff bases this contention on the ALJ's conclusion that Plaintiff's primary obstacle to employment since his release from prison has been his criminal record.  Plaintiff states that he "sought and received mental health treatment for

years prior to release from jail and sought treatment after his release." Plaintiff states that he attempted to return to work after being released but was unsuccessful "partly due to mental illness symptoms, which he reported to treatment providers." Plaintiff argues that his "established pattern of behavior is consistent with an individual suffering from and seeking treatment for chronic mental illness." Plaintiff further states that it is "altogether plausible" that an individual recently released from prison "would have difficulty in continuity of care secondary to financial and insurance issues."

As the Court concluded in Sections I.A and I.B, the ALJ did not base his RFC determination on any one factor in isolation; instead, he thoroughly reviewed the entirety of the record to determine the appropriate RFC. The ALJ provided substantial evidence for his finding that the primary obstacle to Plaintiff's employment was his criminal record. (R. at 27 & Exh. 5F-7F, 32F). The ALJ also considered Plaintiff's entire mental and physical health treatment history in crafting the RFC. (R. at 22-33). While Plaintiff seeks to argue with what he believes the ALJ's RFC analysis may imply or what may or may not be plausible with respect to his ability to obtain care, this Court is constrained to the determination solely of whether the ALJ supported his conclusions with substantial evidence. This Court may not attempt to engage in an analysis of whether it does or does not concur with the ALJ's findings. Thus, the Court concludes that the ALJ did not err with respect to these findings.

## II. Improper Weighing of Medical Opinion Evidence in RFC Analysis

Second, Plaintiff argues that the ALJ erred in weighing the opinion evidence in the record in crafting Plaintiff's RFC. The ALJ's assessment of medical source opinions must follow 20 C.F.R. § 404.1527(c) and § 416.927(c), which contain six factors. First, the ALJ must examine the relationship between the patient and medical professional, as more weight is accorded to an

examining source. 20 C.F.R. §§ 404.1527(c)(1) & 416.927(c)(1). Second, the ALJ must consider whether the medical professional actually treated the patient, as "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). If a treating source's opinion on the nature and severity of the impairment(s) is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the ALJ] will give it controlling weight." 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). If a treating source's opinion is not given controlling weight, the ALJ must consider the length of the treatment relationship and the frequency of examination along with the nature and extent of the treatment relationship to determine if his or her opinion should be given more weight than a nontreating source. 20 C.F.R. §§ 404.1527(c)(2), (c)(2)(I)-(ii), 416.927(c)(2) & 416.927(c)(2)(I)-(ii). The ALJ must "always give good reasons" in the notice of determination or decision for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2) & 416.927(c)(2).

Third, the ALJ must consider the amount of relevant evidence the medical source provides to support the opinion, particularly medical signs and laboratory findings, to determine the amount of weight to be given to the opinion. 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3). As to nontreating sources, the weight accorded to their opinions will "depend on the degree to which they provide supporting explanations for their opinions." *Id*. The ALJ must also "evaluate the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of

treating and other examining sources."  *Id.*

Fourth, the ALJ must consider the consistency of the opinion, as the more consistent an opinion is with the record as a whole, the more weight it will be given.  20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4).  Fifth, the ALJ generally gives more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to an opinion of a source who is not a specialist.  20 C.F.R. §§ 404.1527(c)(5) & 416.927(c)(5).  Sixth, the ALJ will consider any factors the claimant or others bring to his or her attention, or of which he or she is aware, which tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(6) & 416.927(c)(6).

### A. Dr. Joslin

Plaintiff first asserts that the ALJ accorded insufficient weight to the opinion of Rebecca P. Joslin ("Dr. Joslin"), who concluded that Plaintiff had markedly limited ability to interact with the general public but who found Plaintiff was not significantly limited or only moderately limited in all other categories.  (R. at 721).  Plaintiff argues that this error is particularly egregious in light of the Appeals Council's instructions on remand to ALJ Ingram, which included the following issue to be resolved:  "The hearing decision does not accurately describe the opinion expressed by Dr. Joslin, Ed.D. in Exhibit 10F. . . .  The decision indicates that Dr. Joslin was of the opinion that the claimant was able to interact appropriately with the general public.  However, Dr. Joslin indicated, among other things, that the claimant is unable to interact appropriately with the general public."  (R. at 125).  The record reflects that Dr. Joslin performed a "DDS Medical Consultant Analysis" and does not reflect that she was a treating source.  (R. at 792).

ALJ Ingram considered Dr. Joslin's opinions along with other state agency psychological consultants' mental assessments but gave them only partial weight "because evidence at the hearing

18

suggests that the claimant may be *more* limited than they originally determined." (R. at 30) (emphasis added). ALJ Ingram further concluded that the state agency psychological consultants' mental assessments are "well supported by objective medical evidence" and are "consistent with the record as a whole when they were provided." (R. at 30). This is consistent with the ALJ's requirement to consider supportability and consistency. 20 C.F.R. §§ 404.1527(c)(3)-(4) & 416.927(c)(3)-(4). Additionally, ALJ Ingram did note that Dr. Joslin and the other state agency psychological consultants' opinions indicated that Plaintiff was more limited than previously determined, consistent with the Appeals Council's remand instructions. Further, as Dr. Joslin is not a treating source, ALJ Ingram was not required to "give good reasons in [his] notice of determination or decision for the weight" accorded to her opinion. *See* 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2); *see also Norris v. Comm'r of Social Security*, 461 Fed. App'x 433, 439 (6th Cir. 2012); *Smith v. Comm'r of Social Security*, 482 F.3d 873, 976 (6th Cir. 2007). Following ALJ Ingram's decision, the Appeals Council denied Plaintiff's appeal. Accordingly, the Court finds that ALJ Ingram did not err in weighing Dr. Joslin's opinion.

### *B. Dr. Rutledge*

Next, Plaintiff contends that the ALJ erred in assigning "partial weight" to the consultative psychological assessment of Dr. Rutledge. (R. at 31). Plaintiff asserts that the ALJ did not adequately explain which portions of Dr. Rutledge's opinions were accepted and which were rejected. (R. at 31-32). Further, Plaintiff contends that the ALJ's bases for assigning partial weight are not persuasive. Specifically, Plaintiff argues that the ALJ rejected Dr. Rutledge's opinion, in part, due to Plaintiff's malingering and/or symptom exaggeration. (R. at 31) ("Dr. Rutledge also noted that the claimant was occasionally evasive, guarded, and vague and it is therefore reasonable

for one to believe the claimant's failure to remain on topic could be evidence of his attempt to portray himself as more limited than he actually is."). Plaintiff points to Dr. Rutledge's findings that he believed that Plaintiff gave a "reasonable" effort and "showed no evidence of malingering" (R. at 1038) and "showed evidence of moderate to marked impairment in ability to sustain concentration" (R. at 1040).

As to Plaintiff's contention that the ALJ did not adequately explain which portions of Dr. Rutledge's opinions were accepted or rejected, he is not required to do so for a consultative source. *See* 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2); *see also Norris*, 461 Fed. App'x at 439; *Smith*, 482 F.3d at 976. Further, substantial evidence supports the ALJ's partial rejection of Dr. Rutledge's consultative opinions based upon other opinions he provided and the record as a whole. Specifically, Dr. Rutledge concluded that Plaintiff gave a "reasonable, *but guarded* amount of effort throughout the interview," but was "resistent" and "occasionally evasive." (R. at 1038). The ALJ further found that Dr. Rutledge's opinion was "only partly supported by objective medical evidence" and does not "reflect the longitudinal record," both of which are factors which the ALJ is required to consider. (R. at 31); *see* 20 C.F.R. §§ 404.1527(c)(3)-(4) & 416.927(c)(3)-(4). Accordingly, the Court concludes that the ALJ did not err in weighing Dr. Rutledge's opinion.

### C. Dr. Michael Guinle

Next, Plaintiff argues that the ALJ erred by assigning "very little weight" to the opinion of Dr. Michael Guinle ("Dr. Guinle"). Plaintiff complains that the ALJ incorrectly found that Dr. Guinle based his findings on Martin's subjective complaints when Dr. Guinle also reviewed other medical records and another medical evaluation. (R. at 1204). Plaintiff states that Dr. Guinle also completed his own mental status examination and observed as follows: that Plaintiff's "presentation

was clearly one of a markedly anxious and suspicious individual" (R. at 1206-07); that "[s]igns of possible anxiety were readily apparent and included facial vigilence, body stiffness, suspiciousness of his surroundings and occasionally anxious speech pattern" (R. at 1206); and, that "his anxious signs never fully subsided throughout the lengthy examination" (*Id.*)

Plaintiff also notes that Dr. Guinle assigned moderate impairments in carrying out simple instructions, moderate and/or marked impairments in the ability to make judgments on single work-related decisions, marked impairments in the ability to understand and remember complex instructions, moderate to extreme impairments in the ability to make judgments on complex work-related delusions, and extreme impairments in the ability to carry out complex work-related decisions. (R. at 1208). Finally, Plaintiff argues that the ALJ accorded very little weight to Dr. Guinle's opinion because he examined him only once upon referral by legal counsel but that the same was true with all DDS examiners except Dr. Keown. (Tr. at 33). Plaintiff asserts that the other DDS examiners reviewed very limited records, vague or unidentified records, or no records at all prior to the examination, unlike Dr. Guinle. (Tr. at 680, 693-99, 1024-1029, 1034, 1115, 1125).

The Commissioner posits that the ALJ had good cause to reject Dr. Guinle's opinion because other portions of Dr. Guinle's own report indicated that Plaintiff did not have such significant mental limitations. (Tr. at 33, 1207, 1209). The Commissioner also argues that Dr. Guinle's findings on Plaintiff's limitations are inconsistent with the record as a whole. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 472 (6th Cir. 2014).

The ALJ concluded that Dr. Guinle's "highly restrictive medical opinion" was "based heavily upon the claimant's subjective complaints rather than the actual objective medical evidence and it is wholly inconsistent with the record as [a] whole." (R. at 33). The ALJ noted that "Dr. Guinle's

assessment was highly inconsistent with his own examination findings." (*Id.*) Specifically, the ALJ found that Dr. Guinle "opined that the claimant's ability to respond appropriately to usual work situations and changes in a routine work setting was extremely impaired" but that his "examination notes show the claimant was able to recognize and manage hazards and respond appropriately to them on the job." (*Id.* at 33 & Exh. 47F). The ALJ also noted that Dr. Guinle is not a treating physician but only conducted a consultative examination. (*Id.*)

Upon review, the ALJ is required to consider the relationship between the opinion source and the claimant. In this case, the ALJ correctly found that Dr. Guinle did not treat Plaintiff but only provided a consultative medical opinion. (R. at 33). This lack of a treatment relationship is one proper reason for the ALJ to accord his opinion lesser weight. 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).

The ALJ is additionally required to consider the supportability of the medical source opinion and give more weight to opinions supported by relevant evidence, particularly medical signs and laboratory findings. 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3). While it is true that Dr. Guinle did consider certain of Plaintiff's mental health treatment records and the findings of another consultative medical source, the Court's review of Dr. Guinle's findings indicate that substantial evidence supports the ALJ's conclusion that the majority of his report was based upon Plaintiff's subjective complaints. (Tr. at 1204-1210). This lack of supportability is one proper reason for the ALJ to accord his opinion lesser weight.

The ALJ is also required to consider the consistency of the medical source opinion. 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4). The Court concluded that substantial evidence supports the ALJ's conclusion that Dr. Guinle's report has internal inconsistencies. The Court also concludes

that substantial evidence supports the ALJ's conclusion that the record as a whole is inconsistent with the degree of impairments assigned by Dr. Guinle. This lack of consistency is another proper reason for the ALJ to accord his opinion lesser weight. Accordingly, the Court concludes that the ALJ did not err in weighing Dr. Guinle's opinion.

### D. Mr. Kurt Moss

Next, Plaintiff contends that the ALJ erred by rejecting the opinion of Kurt Moss ("Mr. Moss"), concluding that "Mr. Moss does not appear to be an acceptable medical source" because he "did not include any professional identifier next to his name/signature." Plaintiff argues that treating psychiatrist Dr. John Pharis ("Dr. Pharis") also signed Mr. Moss's statement and that it would have been "reasonable to infer that Dr. Pharis concurred with Mr. Moss's assessment upon subsequent review of the file." Plaintiff further argues that Dr. Pharis's signature could be considered as an adoption of Mr. Moss's statement, converting it into a treating source opinion that would require "specific regulatory analysis be conducted in the present case." *See* 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2). Finally, Plaintiff contends that Mr. Moss's statement is consistent with the record as a whole.

The Commissioner responds that the ALJ did consider Dr. Pharis's opinion along with Mr. Moss and rejected both because they were not supported by objective evidence or consistent with the record as a whole. The Commissioner also argues that Plaintiff has offered no substantive challenge regarding Mr. Moss and Dr. Pharis.

Upon review, it is apparently not disputed that Mr. Moss is not a proper medical source, and substantial evidence supports the ALJ's conclusion that he was not based upon the lack of professional identifiers in his report. While the ALJ did not acknowledge Dr. Pharis's signature on

his report, even if this Court were to consider Mr. Moss's statement to be adopted by Dr. Pharis and therefore the opinion of a treating source, the ALJ nonetheless provided "good reasons in [his] notice of determination or decision for the weight" he gave Mr. Moss's opinion. Specifically, the ALJ concluded that, "despite opining the claimant was psychiatrically unstable, Mr. Moss actually noted the claimant's appearance, eye contact, orientation, attitude recent and remote memory, speech, attention/concentration, thought process, thought content, impulse control, and judgment were within normal limits on examination in January 2009." Lack of consistency is a proper reason to accord an opinion—even one deemed to be adopted by a treating source—lesser weight. 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4). Further, as to treating sources, if not giving controlling weight, the ALJ must consider the length of the treatment relationship and the frequency of examination and the nature and extent of the treatment relationship. 20 C.F.R. §§ 404.1527(c)(2)(I)-(ii) & 416.927(c)(2)(I)-(ii). The ALJ did so as to Dr. Pharis in consideration of his opinions. (R. at 32). Accordingly, even though the ALJ did not specifically address whether Dr. Pharis adopted Mr. Moss's statement, he nonetheless addressed all of the required factors even had this statement been adopted. Thus, the Court finds that the ALJ did not err in his consideration of Mr. Moss and Dr. Pharis's opinions.

### E. Dr. Briggs and Dr. Burge

Finally, Plaintiff argues that the ALJ erred by assigning "great weight" to the examinations of non-examining physicians Dr. Nathaniel Briggs ("Dr. Briggs") and Dr. Stephen Burge ("Dr. Burge"). Plaintiff contends Dr. Briggs provided "absolutely no rationale for reaching his conclusion," and Dr. Burge's opinion "provides no analysis whatsoever." (R. at 1047-55, 1111). The Commissioner responds that it is the role of the ALJ to weight conflicting medical evidence and

that his conclusion should not be disturbed unless it is not supported by substantial evidence.  *See*

*Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 588 (6th Cir. 2013).

Upon review, the ALJ explained that he gave "great weight" to these "most restrictive State agency medical consultants' physical assessments . . . because they are well supported by objective medical evidence and they most accurately reflect the record as a whole."  (R. at 29).  This is consistent with the ALJ's obligations under 20 C.F.R. §§ 404.1527(c)(3)-(4) and 416.927(c)(3)-(4). The ALJ was not required to provide further explanation for his determination of the weight accorded to these non-treating sources.  20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  Accordingly, the Court finds that the ALJ did not err in weighing Dr. Briggs and Dr. Burge's opinions.

## II.  Step Five Findings

Plaintiff raises two issues as to the ALJ's Step Five analysis.  First, Plaintiff asserts that the ALJ failed to obtain vocational expert testimony pursuant to Social Security Ruling 83-14 ("SSR 83-14").  Plaintiff acknowledges that vocational expert testimony is not required but argues that the purpose of SSR 83-14 is to guide an ALJ when such testimony "may be necessary."  *See* SSR 83-14. Plaintiff also relies on SSR 83-14's provision that, where nonexertional limitations or restrictions within the medium work category are between the examples listed therein, a decisionmaker will often require the assistance of a vocational expert.  *Id*.  Plaintiff further argues that the ruling includes examples of medium exertional work with nonexertional impairments as in Plaintiff's own claim.  *Id*.  The Commissioner responds that SSR 83-14 does not apply to Plaintiff's case, as the ALJ found that Plaintiff could perform the full range of medium work except the job needed to have simple instructions, involve simple work-related decisions, and have routine demands, none of which is mentioned in the portion of SSR 83-14 cited by Plaintiff.  (Tr. at 22).

Upon review, the Court is compelled by the undisputed fact that the ALJ was not required by SSR 83-14 to receive vocational expert testimony. Absent such a requirement, the Court has been presented no authority as to why the ALJ's decision should be disturbed. Accordingly, the Court concludes that the ALJ did not err in failing to obtain vocational expert testimony.

Second, Plaintiff asserts that the ALJ erred in concluding that significant numbers of jobs exist in the national economy that he could perform. Specifically, Plaintiff argues that the ALJ "failed to disclose the source of information" from which he concluded that approximately 2,500 separate sedentary, light, and medium occupations can be identified. (R. at 34). The Commissioner responds that the medical-vocational guidelines take administrative notice of the number of jobs that exist throughout the national economy at the various functional levels and, "when all factors coincide with the criteria of a rule, the existence of such jobs is established." *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b).

Upon review, the Court finds that the medical-vocational guidelines, as cited by the ALJ, set forth as follows:

> The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do not require skills or previous experience and which can be performed after a short demonstration or within 30 days.

*Id*. § 203.00. Accordingly, the Court finds that the ALJ did not err in concluding that a significant number of jobs exist in the national economy that Plaintiff could perform.

Therefore, upon a finding that the ALJ's decision was supported by substantial evidence and applied the correct legal standards, the decision of the Commissioner is AFFIRMED.

**IT IS SO ORDERED** this 8th day of December, 2015.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE
